UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CASE NO. 0540 1:20CR00083-10 |
| | § | |
| BOBBY DAYLE BONEY | § | |

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Bobby Dayle Boney, comes before the Court for sentencing after having pled guilty to one count of assault resulting in serious bodily injury in aid of racketeering which is a violation of 18 U.S.C. § 1959(a) (3).  Mr. Boney submits this sentencing memorandum to aid the Court in determining an appropriate sentence under 18 U.S.C. § 1959(a) (3).  The U.S. Probation Office ("Probation") has calculated, under the U.S. Sentencing Guidelines (the "Guidelines"), a sentencing range of 77-96 months in prison with a recommended sentence of 96 months.

### INTRODUCTION

The defendant was born in Gymond, Oklahoma, and grew up in Gruver, Texas where his father's farm was located.  The defendant's parents were together during his childhood, but his father was not consistently present in his life.  The defendant is currently married to Ginger Boney.  He has one biological daughter, Brittany Boney, who is twenty-eight years old, and has three step children Gracy, 9, Calvin, 13, and Marcus, 14. The children live with his wife in his home.

Mr. Boney graduated from Gruver High School in 1989, and then joined the military. The defendant joined the Army April of 1990, and after finishing basic training he was stationed in

1

Saudi Arabia where he remained for nine months. In April of 1994 the defendant was honorably discharged. Upon leaving the military he began selling cars until he filed for divorce which made it difficult for him to maintain employment. Between the divorce and struggling to maintain employment, the defendant was faced with challenges he had never experienced until this point of his life.

From the year 2000-2008 he worked in the oil field, but was struggling with a drug addiction. From the year 2008-2012 the defendant went to prison for drug related offenses. From 2012-2019 he worked for the same company, Light Shell Drilling. During this time, he received a job offer from Enzine Drilling which only lasted a few months due to COVID-19. The defendant was laid off in April 2020 and decided to go apply for his CDL. At the time of arrest, he worked for U.S. Express driving trucks.

## ARGUMENT

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of the statute. In undertaking its analysis, the Court considers the advisory sentencing range recommended by the guidelines and any relevant guideline policy statements, as well as other traditional sentencing factors.

### *Offense Conduct*

In this case, Mr. Boney pled guilty to one count of assault resulting in serious bodily injury in aid of racketeering which is a violation of 18 U.S.C. § 1959(a)(3). The offense conduct is set forth in detail in the Factual Resume filed with this court, which Mr. Boney accepted during his change of plea hearing. Therefore, the offense conduct is briefly summarized below.

2

The defendant, a member of the Aryan Circle (hereinafter AC), had actively distanced himself from all operations associated with the AC.  On October 2, 2016, the defendant was aware that AC activities were to take place in which his participation was necessary. To remove himself from the potential situation, the defendant turned off his phone so that he could not be reached that day. Michael Lyons, a member of the AC, and his wife Carolyn McFarlin continuously failed to reach the defendant, so they reached out to his wife Ginger Mangus. Ginger, unaware of the situation, answered a Facebook call from Carolyn and handed the phone over to the Mr. Boney.

There are dangerous consequences associated with denying a direct order, so Mr. Boney was forced to meet at a park near Tyler, Texas where the defendant and the AC were to execute a plan of removing K.C., an AC member, from the organization. K.C. intended to transfer his gang affiliation from the AC to the Banditos and was fully aware of the ramification associated with removal from the AC, referred to as being "smashed out." Furthermore, it was K.C. who arranged this meeting in order to "patch over." The decision to appear at the park, coupled with the assault that took place, was completely consensual on behalf of K.C. An affidavit, produced by the defendant, has been attached detailing the events that took place on the date of the assault. There is no dispute that an assault causing bodily injury took place.

### *Personal Life*

Mr. Boney comes from humble beginnings in Gymond, Oklahoma and has worked hard to provide for himself as well as his family.  He succeeded in graduating high school, joining the Army, completing truck driving school and obtaining steady, full-time employment.   Attached to this memorandum are letters referencing Mr. Boney's character.

### The Purpose of Sentencing

Pursuant to the sentencing statute, a defendant's sentence should be designed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2)

To be clear, Mr. Boney does not dispute his guilt, but the circumstances surrounding this incident do not warrant a substantial period of imprisonment in this case.

**The Kinds of Sentences Available**

The Court has the authority and discretion to impose a wide range of alternatives to the lengthy term of incarceration contemplated by the Guidelines, or the maximum penalty authorized under the relevant statutes. *See* 18 U.S.C. §§ 3553(a)(3) and 3561(a)(1). A sentence at the lowest end of the guidelines is appropriate in this case in light of Mr. Boney's remorse for his conduct, attempts to distance himself from the AC and his responsibilities, and his acceptance of responsibility as reflected in the plea agreement.

**The Sentencing Guidelines and The Commission's Policy Statements**

    **a.   Enhancement for Brandishing/Threatening a Firearm**

Mr. Boney objects to the PSR with regard to Probation's inclusion of an enhancement for brandishing or threatening a firearm under the provisions of U.S.S.G. § 2A2.2(b)(2)(C). Factually and legally it is not appropriate to assess the three-level increase in this case.

The Presentence Report quotes an increase of three levels pursuant to U.S.S.G. § § 2A2.2(b)(2)(C).   The defendant has objected to that increase.

In order to apply the three-level increase pursuant to § 2A2.2(b)(2)(C) the government must prove by a preponderance of the evidence that the defendant actually or constructively possessed the weapon, and such possession was during the relevant conduct of the offense.

To prove constructive possession, the government must show that "the defendant knew of, and was in a position to exercise dominion and control over" the item in question. *United States v. Dorman*, 860 F.3d 675, 679 (D.C. Cir. 2017) (quoting United States v. Littlejohn, 489 F.3d 1335, 1338 (D.C. Cir. 2007)). There must be something more than mere presence at the scene of a criminal transaction. There must be some action, some word, or some conduct that links the individual to the gun. *United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980).

At the time of the assault one of the other AC members, Michael Martin, notified K.C. along with the Bandito members who accompanied him that guns were present, and at the conclusion of the beating he informed K.C. that the outcome could have been worse stating that "[W]e the AC, kill people" which also does not serve as a threat to use weapons. Additionally, at no point during the execution of the assault were any weapons brandished or threatened. There was no need to threaten K.C. as the appearance and the assault were completely consensual. The mere notice of weapons does not satisfy the statutory requirement necessary to validate the three-level increase pursuant to U.S.S.G. § 2A2.2(b)(2)(C).

If constructive possession of a weapon during the commission of a crime is shown, which we believe has not been shown, but then and only then Application Note 11 of the Guidelines instructs that then "[t]he enhancement should be applied . . . unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n.11.  In this case, it is clearly improbable that the weapon was connected with the offense.

The firearm, which was not owned by the defendant, had no relation to the assault or the defendant.  The defendant is tied to this case by a series of events, but none of the events had to do with a gun. The gun had nothing to do with the assault that took place.  There is no evidence that the gun was ever used or possessed during any part of the assault.

Therefore, Defendant respectfully objects to Paragraph 35 of the Presentence Investigation.

## Conclusion

Sentencing courts are, of course, charged with the responsibility of treating those that come before them as individuals.  *See* Koon v. United States, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") Courts are charged by Congress, as well, to impose a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a). Mr. Boney respectfully requests this Court to follow that tradition and impose a sentence at the lowest end of the guidelines after removing the three-level enhancement for a firearm.

Respectfully submitted,

Deaton Law Firm
P O. Box 1964
103 East Denman
Lufkin, Texas 75902
Telephone (936) 637-7778
Facsimile (936) 637-7784

By:   /s/ T. Ryan Deaton_____
        Attorney for Defendant
        Bar Card # 24007095

6

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Sentencing Memorandum was provided to the following parties on August 25, 2021:

Mr. Christopher Thomas Rapp
Assistant United States Attorney


 /s/ T. Ryan Deaton
T. Ryan Deaton

## AFFIDAVIT OF GINGER MANGUS

STATE OF TEXAS                                §
                                             §
COUNTY OF ANGELINA                            §

On ___July 1___, 2021, Ginger Mangus appeared before the undersigned notary

public and made the following affidavit:

I met Bobby Boney in September of 2015, when he was renting a room from a friend of mine. Bobby was working on an oil rig, but when he was home from the rig, he stayed to himself. He once expressed to me that he had moved there to get away from certain people. A few months later he opened up to me about his past and how he used to be involved with a gang that he joined while he was in jail many years ago. He now enjoyed his freedom away from the pressures of the gang and was proud of his new life just going to work and coming home to friends and family. He also told me, which I later witnessed, how he would try to help ex members of the gang get jobs in the oil field and help them get off of drugs because in order to be hired on in the oil field you had to pass a hair follicle drug test. He has a big heart for people who have gone through what he had.

Bobby reassured me he was no longer a part of it. I knew this to be true because I was spending everyday with him that he was home from the oil rig. There were times we had to just leave the house for a few days because there were too many people over and some of them would smoke weed and Bobby refused to be around that. Bobby would get a hair follicle test every 3 months for work and I, as an RN, couldn't be there inhaling 2nd hand smoke either. Since he was away for work more than he was home he just put up with the inconveniences hoping to move soon as our relationship became more serious. Looking back, we should have made that happen immediately.

Bobby came home from a two-week hitch on Tuesday, September 27, 2016. His sister's 40th birthday was that Sunday October 2, 2016. We made plans to spend the weekend in Arlington at his sister's house to celebrate and so I could meet his family for the first time since we had just made our relationship official. We were headed out the door Friday (Sept 30th) and I remember a heated discussion between Michael and Bobby regarding the fact that Bobby would not be back by Sunday. I didn't think too much of it because Michael and Carolyn were always trying to get Bobby to work for their tree and landscaping business on Bobby's days off from the rig.

Bobby and I stayed at his sister's house Friday and Saturday night and had a whole day planned with his sister on Sunday Oct 2, since that was her actual birthday. That morning of Oct 2, 2016, I did not realize that Bobby had turned his phone off for a reason. It was sometime right before noon that Carolyn McFarlin called me via Face Book. She did not have my phone number and I had never received a call from her so I thought it might be an emergency. I immediately

answered my phone and she asked where Bobby was and why he wasn't answering his phone. I said, "he's right here" and handed my phone to Bobby. If I could take a moment back in time, I would have never given the phone to Bobby because that then put him in a compromised position that he was trying to avoid.

When Bobby realized who was on the other end of the call, he had the most frustrated and perturbed look on his face. He talked to Carolyn for a minute and then Michael. When he hung up the phone. He just looked defeated and told me that he had turned his phone off so that they couldn't get ahold of him. He told me that Michael expected him to be at a Bar-B-Q in Tyler that day but that he had no intentions of going. He said that we would just take our time getting ready to leave so that we would show up late to the Bar-B-Q. We showed up to Tyler sometime later that afternoon. There were several people there and there was talk of a Bar-B-Q. The wife of the house asked if I would watch her two little girls while she and a friend ran to the grocery store to get items for the Bar-B-Q. About that time Bobby told me he had to go somewhere with Michael and Carolyn but that he would be right back. I stayed at the house with the two little girls until their mom got back from the store. I then helped her prepare food and shortly after that, everyone else showed back up and we ate.

Bobby did later explain to me what happened that day and how Michael had threatened him if he didn't show up and the pressure he felt since Michael was his landlord. The times we have discussed the incident since, Bobby was filled with regret, remorse and shame that he allowed Michael and Carolyn to pressure him into this situation since he had made it clear that he wanted nothing more to do with the gang.

Four years ago we moved and bought a house in Sulphur Springs where nobody knew where we lived and got married. He went to work and I stayed home with the kids, my youngest two with severe disabilities, and lived a quiet life never associating with those people again.

Ginger Mangus
_____
Ginger Mangus

Sworn to and subscribed before me on ~~June~~ July 1 , 2021.

THERESA L MOSS
Notary ID #130926177
My Commission Expires
December 8, 2024

Theresa L Mos
_____
NOTARY PUBLIC

**Personal Reference Letter on behalf of Mr. Bobby Boney**                                        3/27/2021

From:  Michael J. Hopton
          137 Rattling Antler Ct.
          Azle, TX 76020
          702 882-4415

Hello, my name is Mike Hopton and Bobby Boney is my brother-in-law, he is married to my wife's sister Ginger Boney.

I've known Bobby for about 4 years, we met in 2017 when he was dating Ginger.  Over these past 4 years I've have gotten to know Bobby fairly well through typical family gatherings, weddings, holidays, and good ole Sunday BBQs.  During these gatherings and occasional phone conversations we have had many heart to heart chats about a variety of topics; careers, relationships with our wives and children, financial challenges, and just typical day to day trials and challenges of life.  We have also talked about our continuing growth in God, our savior.  During these talks I have learned a lot about Bobby.  He has shared some of his past with me and his regrets in some of the poor choices he made when he was younger.  I know a completely different Bobby.  The Bobby I know today is an honest humble, hardworking family man I consider a good friend.  He is a man who I can trust and count on if ever I needed help whether a family emergency, someone to help me move furniture of just someone to talk to when I just need someone to talk to.  I trust him.

I have also seen the way he interacts with his family.  Bobby is a committed family man who adores and loves his wife unconditionally.  He is the step father to 2 young typical boys full of life and energy, Marcus and Calvin and a sweetheart of a little girl named Gracie.  He raises these children as if they were his own, with lots of love, patience, and guidance and discipline.  As most parents, his desire is to develop and nurture these children to become men and women with a strong relationship with God, the utmost respect for others, and a solid foundation reinforced by solid morals and values.

Bobby also embodies another key component of a family man; the financial provider of the family.  As the sole provider of the household, Bobby worked very long hours that required out of town travel for weeks at a time.  Bobby is the kind of man who would dig ditches if need be to support Ginger, Marcus, Calvin and Gracie.  He has worked oil rigs, and driven 18 wheelers and during some of our heart to heart talks he has told me on several occasions that these career choices are not his passion and he can't stand being away from his family; he does it to provide for his family.

Bobby and I have also connected through our love of this great country of ours.  We both served in the military, (he was Army and I was Air Force).  We both served during Deseret Storm along with numerous other campaigns.  Naturally and instantly, we formed a brotherhood when we learned of each other's prior service to our country.  Bobby, is a patriot and has a profound respect and love for our nation and still hold these values near and dear to his heart.

My hopes and intentions of this letter is for you to learn a little more about Bobby and the man I have come to know and love as a brother-in-law and a friend.  Bobby is a good man, and a fun-loving family man.  His wife, his boys and his little girl need him in their lives.  In addition to the sole financial support he provides, they need him for his love and guidance, and the much needed father figure role he used to fulfill.  This family desperately needs Bobby back in their lives and since he has been gone there has been a major void.  Ginger and the children have been greatly impacted by his absence.  Major

financial challenges, bills continue to pile up while Ginger pleads with bill collectors for alternative and extended payment options.  The children miss him dearly and have learned to depend on him for that father figure all children need in their lives whether to fix the flat tire on their bike or to just give those daily dad pep talks.

When making your decision, I would ask that you please consider the things I have mentioned in this letter; the man Bobby is today – a family man who just wants a better life for his wife, his children and for himself.  I ask you to give him the benefit of any doubt you may have witnessed by the prosecutor(s) who don't know him like I do.  Bobby is a good man, and I ask you to consider his positive character traits I have tried to relay to you in the letter.

I appreciate the time you have taken to read this letter, and I thank you for your consideration.

Sincerely,

Michael J. Hopton

March 29, 2021

Honorable Judge

Dear Honorable Judge

I'm writing to provide a character reference for Bobby Boney.  Bobby is my brother-in-law.  He married my sister two years ago but I have known him for several years.

My sister has 3 young children, 2 of which have special needs.  Bobby not only loves my sister, but he has loved her children from the very beginning like his own.  They all look up to him and they depend on him.  My sister has struggled financially the last few years and Bobby has not blinked an eye stepping up to take care of her and the kids.  He bought a home for them and works to allow my sister to stay home to help meet the needs of the children, which includes frequent doctor appointments, meetings at school, etc.  He provides the primary source of income for his family and I know they are struggling again without him.

I realize Bobby has a history and had bad associations years ago, and he's talked to us about his past.  He's also talked about learning from his mistakes and how happy he is to have a different life.  He loves Jesus and has been on the right track for years now and I have no doubt his priorities and purpose are taking care of his family, nothing else.

If you've not met Bobby already, you'll notice when you do that he is a big guy.  What you might not see right away is his big heart.  I'm here to testify to his heart.  He has a good heart with a deep love for his savior, his wife, and his step children. Bobby belongs with his wife and family who depend on him as the head of their house and their soul provider.  My family and I love Bobby and his absence has caused a void.  I pray that you see the low risk that a lenient sentence would give. I pray he is free soon to get back to his purpose, taking care of his family and contributing to our society.  Honestly, we need more men, more husbands, and more dads like Bobby.

Sincerely,

Natalie Kehm

**Personal Reference Letter on behalf of Mr. Bobby Boney**                                3/22/2021

From:  Amanda L. Hopton

137 Rattling Antler Ct.

Azle, TX 76020

702 882-4415

My name is Amanda Hopton, Mr. Bobby Boney is my brother-in-law through his marriage to my sister, Ginger Boney.

I met Bobby in 2017 while he was dating my sister, Ginger.  After our first introduction, I sensed he was a good man and over the last four years of knowing him and becoming family, my first impression was correct.  I am honored to know Bobby and to have him as a brother-in-law.  I could not imagine a better man to marry my sister and be the stepfather to her kids.

Bobby, my husband and I are all veterans and have bonded over our love for this country and our past experiences while serving.  His character and level of responsibility exceeds most people I know.  He is kind, honest, respectful, extremely hardworking, and the kind of person who would go out of their way to help a stranger.  He is a family man who lives to provide for his wife and stepchildren.  He is selfless and is always thinking about others before himself.  Bobby is always able to find the positive and make the best out of any situation.

What has most impressed me about Bobby is the love and care he shows towards my sister and his stepchildren, my nephews and niece. He stepped into his role as husband and father, to school aged kids, without hesitation. He is an amazing father to these kids and without otherwise knowing, would assume he's been a part of their life since birth.  They really took to him and there is no better way for me to judge his character than to watch their interactions together.  It warms my heart knowing how much he loves and supports them, especially the interaction with my nephew Calvin.  He has special needs and forming strong bonds during this stage of his life is crucial for his development.  The way Bobby relates to Calvin and the connection they have developed in just a few years, is something truly special!  His love, compassion and support are critical for their wellbeing and removing him from their life would be detrimental.

Ginger is a registered nurse but had to quit when working and raising hearing impaired and special needs children became too difficult to do both successfully.  Bobby is the sole financial provider for their household; diligently working long hours and less desirable jobs that took him away from home, to ensure his family was taken care of.

I am pleading with you to take into consideration my personal accounts of Bobby, the outstanding man he is today, the life he has built and the people who depend on him, when deciding not only his fate, but the fate of his family.

Sincerely,

Amanda L. Hopton

Rebecca Gomez Sebastian
529 Oxford Crossing
Van Alstyne, TX 75495

Your honour,

I have known Bobby Booney for about two years when he married my sister in law, Ginger. In the lapse of that time, he has shown himself trustworthy.

Bobby has made so many sacrifices to bring provision and a steady house for my sister in law and her kids. He lost his job due to the oil industry plummeting but worked so hard to provide. Bobby worked tirelessly in getting his trucking license so that he could have a steady income for my sister-in-law and her kids. I've been able to see them all sore since he has been part of their life. His guidance and patience is so needed for those kids.

We all love him dearly and enjoy his servant heart, always willing to help at any family gathering.  Bobby brings us so much harmony and joy. He is very missed and needed in this family.

I am willing to answer any further questions.

Sincerely,

Rebecca Gomez Sebastian

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: NEIL RICHARDSON, RIG MANAGER for LATSHAW DRILLING

SUBJECT: BOBBY BONEY

My name is Neil Richardson and I'm writing on the behalf of Bobby Boney. I have more 15 years of experience in the oil field and am currently a Rig Manager for Latshaw Drilling LLC.

I first met Bobby in Aug 2016 on Rig 22. I had the opportunity to get to work with Bobby as his direct supervisor (Driller). As time progressed I moved into the Rig Managing position and he moved on to take a place as a Driller due to his good leadership skills and ability to safely lead his crew in getting jobs completed in a timely manner.

I have been informed by Bobby Boney of the situation he is currently in. In regards of this situation I can tell you that this is no longer the life Bobby lives. While I worked with Bobby as his driller I had the opportunity to witness him lead, guide, teach and instruct new to the industry oilfield hands. He was able to instill a safe and efficient working attitude in the new and existing hands. He was always on time for work and never missed a day. In the oilfield we have random hair follicle drug testing every 3 months. This was never an issue for Bobby as he passed each test without an issue and showed up for work fit for duty every day.

I have watched Bobby cut ties from his old way of life and settle down with a family. He worked hours on end, hundreds of miles from home to provide for his new wife and her 3 children from a previous marriage. He was able to buy a house and 2 vehicles. I consider Bobby a great friend and someone I or my family could always count on if in need. He would give the shirt off his back to anyone in need.

In March/2020 the US oilfield started to hemorrhage. Thousands of personnel were laid off as a result from all across the industry. Bobby was unfortunately laid off. Instead of laying up in the house drawing unemployment for an extended amount of time Bobby took up a new career as a truck driver. He got his CDL and finished training and got his own company truck. For all of these reasons I believe Bobby is a changed man. He is no longer the person he was.

Respectfully,

Neil Richardson

469-261-7682

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: SHIRLEY B. SEBASTIAN

SUBJECT: BOBBY BONEY

My name is Shirley Beames Sebastian, and I am writing on behalf of Bobby Boney.

I have worked as a Respiratory Therapist for 32 years, starting at Parkland County Hospital and, for the last 30 years, in the Neonatal Intensive Care Unit of Baylor University Medical Center in Dallas, TX (part of the Baylor Scott & White Health Network).

I am also a wife of 47 years, mother of 6 children, grandmother of 15 children, and Bobby Boney's mother-in-law.

I am proud to have Bobby as a son-in-law and step-father to 5 of my grandchildren, 3 of which are still living at home with my daughter and Bobby until he was recently detained. I have consistently found Bobby to be of outstanding character with humility, integrity, kindness and an impressive work ethic.

Bobby demonstrated great love and care for his wife, step-children, father and sister, as well as his inherited extended family of many brothers and sisters in law, nieces and nephews. He often goes out of his way to bless those in our family in some special way.

I have found Bobby to be a man of faith and integrity. I was amazed at how, after being laid off at the oil fields, he immediately found another way to support his family. Instead of relying on unemployment, he studied hard and diligently to become a truck driver, willing to train and receive only a stipend as he sought to provide a long-term solution as the sole provider of his family.

He had met his goal and was driving his own route the day he was detained, letting authorities know where he was and staying with the rig until he was picked up.

Bobby's diligence to provide for his family has allowed his wife to remain a stay-at-home mother to their youngest 3 children, 2 of which have severe hearing impairment accompanied with behavioral issues and learning disabilities. Bobby not only worked tirelessly to provide his family, but he also gladly stood in as a loving father of these children, often the one who could handle the behavioral issues with compassion, patience and wisdom. They love him dearly and broke their heart at the possibility it could be a very long time before he might return.

Since I have gotten to know Bobby very well these past several years I have found him to be and believe with all my heart he will continue to be an asset to society and an outstanding citizen. He is also very needed these formative years by his family.

Sincerely,

Shirley B. Sebastian

214-213-4724

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: DAVID S. SEBASTIAN

SUBJECT: BOBBY BONEY

My name is David S. Sebastian and I'm writing on behalf of Bobby Boney. I am a Veteran and retired journeyman of the INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES of 20 plus years.

I first met Bobby at my grandson's wedding Nov. 11, 2017. He had been in a relationship with my daughter, Ginger, and was impressed with his good manners, as well as his obvious love and respect for our daughter and her family. Since as we have gathered together at family gatherings as well as visits to his home, I have gotten to see first hand how he has provided for, loved and respected my daughter and her 3 younger children living at home with them. The whole family was honored to prepare for and provide our place for their wedding.

 I have appreciated his strong work ethic especially after his lay-off from his career on the oil fields to quickly seek and prepare to be certified as a truck driver finishing and having his own route

 It is my conviction that further detainment is not only unnecessary but would have the opposite effect and burden society, removing an already rehabilitated, hardworking husband and father to a family that is already struggling without him.


Sincerely,



David S. Sebastian

214-213-7141